UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CR290JCH(SPM) |
| | ) | |
| JULIUS E. HAYDEN, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements be **GRANTED**. [Doc. #19]

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set on **December 10, 2012,** at **9 a.m.** before the Honorable Jean C. Hamilton.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of October, 2012.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
         Plaintiff,              )
                                 )
    vs.                          )        Case No. 4:12CR290JCH(SPM)
                                 )
JULIUS E. HAYDEN,                )
                                 )
         Defendant.              )

## MEMORANDUM

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b).  The Defendant, Julius Eric Hayden, was charged with being a felon in possession of a firearm by way of an indictment on August 1, 2012.  The firearm was seized when St. Louis City police officers stopped and frisked Defendant while he was walking down the street in a neighborhood with a reported spike of burglaries and robberies.

Defendant, represented by Federal Public Defender Sean Vicente, filed a Motion To Suppress statements made to police (both at the scene and post-arrest), as well as the firearm on grounds that they are the fruits of an unlawful search and seizure.  [Doc. #19].  Assistant United States Attorney, John Bird, filed a response on behalf of the United States arguing, among other things, that (1) the initial stop did not implicate Defendant's Fourth Amendment rights and (2) the police officers had reasonable articulable suspicion that Defendant was either attempting or contemplating a burglary. [Doc. #24].  Resolution of Defendant's motion to suppress turns primarily on whether the officers' initial

stop was a seizure for purposes of the Fourth Amendment and whether, as required under  Terry v. Ohio, 392 U.S. 1, 30 (1968), the officers had reasonable articulable suspicion that criminal activity may be afoot.

An evidentiary hearing was held on the Defendant's motion on September 20, 2012.  The United States presented testimony of St. Louis City Police Officer Nicholas Martorano.  Defendant called Mr. James Crockett; however, Mr. Crockett asserted his Fifth Amendment Right against self-incrimination and declined to testify.  Following the hearing, the undersigned ordered a transcript of the proceedings and ordered post-hearing briefs.  [Doc. # 28 & Doc. # 33].  The United States filed a post hearing brief on October 5, 2012 [Doc. #34] and Defendant filed his post hearing brief on October 9, 2012 [Doc. #35].  Based upon the evidence adduced at the hearing, as well as a review of the transcript of the hearing in this matter, and the briefs of the parties, the undersigned makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.    Police Officer Nicholas Martorano graduated from the Police Academy and has been a police officer for six years.  (Tr., p. 5-6).  In December 2011, Officer Martorano was assigned to the Central Patrol Special Operations Unit, a covert unit tasked with responding to certain areas identified as having a spike in crimes – i.e., hot spots.  (Tr., p. 6-7).  Officer Martorano was with the Special Operations Unit for two years.  (Tr., p. 7).

2.     On the evening of December 20, 2011, at approximately 9 p.m. Officer Martorano and his partner, Michael Kegel, stopped Defendant Julius Hayden and his friend, Mr. James Crockett, while they were walking near the 4100 block of Evans in St. Louis.  (Tr., p. 9, 17).

3.     The officers were patrolling the area, having received a general briefing at the start of their shift that there had been a spike of armed burglaries and robberies in the area within the past few weeks.  (Tr., p. 8, 34). However, they were given no specific descriptors of potential suspects and were not necessarily on the lookout for African American males fitting the Defendant's and/or Mr. Crockett's description.  (Tr., p. 34).  Before stopping Defendant and Mr. Crockett, the officers had no information linking either man to any criminal activity.  (Tr., p. 34).

4.     Immediately before stopping Defendant and Mr. Crockett, the officers briefly observed the two men standing "relatively close" to a vacant residence. (Tr., p. 10).   When they first noticed the men, the officers "immediately pulled [their vehicle] to the curb and sat and watched." (Tr., p. 11).  The officers left their headlights on.  (Tr., p. 12).  The street was dimly lit and both men were dressed in dark clothing.  (Tr., p. 10).   The officers were too far away to be able distinguish one man from the other.  (Tr., p. 13).

5.     Officer Martorano testified that one man was "wandering around the front of the residence" and the other man was located closer to the sidewalk in front of the residence.  Id.  He observed the man closer to the sidewalk "every now and then to be kind of looking around, looking left, looking right,

and just kind of looking up and down the street." (Tr., p. 11). Although Officer Martorano further testified that the other individual who was "wandering around the front of the residence" at some point "glanced" in a window, this testimony does not seem credible given his description of the poor lighting and distance from the two men. (Tr., p. 37, 38).[1]

6.      Neither man appeared to have a pry bar or any other burglary tool. (Tr., p. 35).  The officers did not observe either man make any attempt to actually enter the residence by, for example, prying at a window or trying to kick in a door. (Tr., p. 37).  After about 10-15 seconds, the two men walked down the street apparently without ever becoming aware of the officers' presence. (Tr., p. 11-12, 35, 39).

7.      Officer Martorano testified that, based on the foregoing observations, he believed that the two men were either committing a burglary or looking to see if they could commit a burglary.  (Tr., p. 12).  So, he and Officer Kegel decided to conduct a "pedestrian check" to "further the investigation." (Tr., p. 14).  According to Officer Martorano, a pedestrian check is "an encounter with police" during which the police will "ask for pedigree information, which would be name, date of birth, Social Security number." During a pedestrian check the police "can run [the person] through the system to check for any warrants or wanteds for the person." (Tr., p. 16).

_____

[1]When he initially described his observations of the subject closer to the residence on direct examination, Officer Martorano made no mention of having seen either subject glancing through a window.  *See* Tr., p. 11.  It was only in responding to questions on cross examination did Officer Martorano first indicate that he saw the subject closer to the house "glance in the window."  Tr., p. 38.

8.     The officers pulled their unmarked car up to the intersection where Defendant and Mr. Crockett were about to cross the street. (Tr., p. 9, 17). The officers pulled their vehicle to within five feet of the two men. While the car was stopping, Officer Martorano simultaneously got out of the car, shined his LED flashlight on the men and yelled "Police". (Tr., p. 17). The LED flashlight is "a lot brighter than a normal bulb flashlight." (Tr., p. 20).

9.     Although he was not in uniform, Officer Martorano was wearing a vest with the word "POLICE" emblazoned across the front in letters that were between 6 inches to a foot high. He also wore his badge on a lanyard hanging around his neck. (Tr., p. 39). Officer Martorano testified that he yelled "Police" and shined his flashlight on the two men "to let them know that this is the police." (Tr., p. 17).

10.     When Officer Martorano, got out of the car, yelled "Police" and shined his flashlight, Defendant "bladed his body away from [Officer Martorano] somewhat, and then he put his right hand in his right jacket pocket." (Tr., p. 21). Officer Martorano defined blading as "turning or trying to conceal part of your body." Id.

11.     Officer Martorano immediately ordered Defendant to take his hand out of his pocket and Defendant immediately complied. (Tr., p. 22, 23, 40).

12.     Officer Martorano testified that, based on his experience, and training, "hands is [sic] always a very important thing when dealing with any sort of interaction with the public. If you can see hands free, then you know that you're – you know you're that much safer." (Tr., p. 22).

13.     After Defendant removed his hand from his jacket pocket, Officer Martorano advised Defendant that he was going to conduct a pat down frisk for weapons. (Tr., p. 23). At that point, he was close enough to Defendant that he didn't have to ask him to move closer to the car. (Tr., p. 40). He asked Defendant if he had anything on him that might "poke or stick" him. (Tr., p. 23). In response, Defendant stated he had "a gun on him." Id. Following that disclosure, Officer Martorano handcuffed the Defendant and asked Defendant where the gun was located. (Tr., p. 24). Defendant told him the gun was in his right jacket pocket. (Tr., p. 24, 25). Officer Martorano then reached into Defendant's right jacket pocket and retrieved a loaded .22 caliber revolver. (Tr., p. 25).

14.     Detective Martorano charged Defendant with unlawful use of a firearm and read him his Miranda rights at the scene. (Tr., p. 26). While still at the scene, and after being read his rights, Defendant stated he needed the gun for protection. (Tr., p. 27, 28). Defendant was then taken to the Central Patrol Station where he was read his rights again. Id. Defendant signed a warning and waiver form and then proceeded to give a recorded statement. Id. and Exhs. EH1 and EH2.

15.     Officer Kegel similarly handcuffed and searched Mr. Crockett and discovered a firearm on him as well. Mr. Crockett, who was also placed under arrest, made a recorded statement to the police after signing a written warning and waiver of his Miranda rights. See Exh. EH2.

16.     Following his arrest, Defendant made incriminating statements regarding possession of the firearm.  Defendant also stated that, at the time the officers intercepted him, he was walking home from a nearby store where he had purchased a pack of cigarettes and his friend, Mr. Crockett, had used the ATM.  Defendant's account of his actions immediately before his arrest was corroborated by Mr. Crockett's separate post-arrest statement to police.  <u>See</u> Exh. EH2.

## <u>CONCLUSIONS OF LAW</u>

The Fourth Amendment prohibits "unreasonable searches and seizures...." U.S. Const. Amend. IV.  Generally, for a search and seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause unless exigent circumstances excuse compliance with the warrant requirement.  <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968).   However, under the narrowly drawn exception to the warrant requirement established in <u>Terry</u>, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).  Any evidence obtained pursuant to an investigatory stop (also known as a "<u>Terry</u> stop" or a "stop and frisk") that does not meet this exception must be suppressed as "fruit of the poisonous tree."  <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

A. **<u>The Seizure</u>**

In determining whether Officer Martorano had reasonable suspicion, the court must first determine when the seizure of Defendant occurred. Only after fixing the point of seizure can the court evaluate the presence or absence of reasonable suspicion because the court must consider only "the facts available to the officer at the moment of the seizure." <u>Terry</u>, 392 U.S. at 21–22; <u>see</u> <u>also</u> <u>Florida v. J.L.</u>, 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.").

Defendant contends he was first "seized" within the meaning of the Fourth Amendment when Officers Kegel and Martorano intersected him and Mr. Crockett for the purpose of performing a pedestrian check. [Doc. #35, at p. 8, 11-12]. The government denies that the officers' initial approach was a "seizure" and argues instead that Defendant was not seized until Officer Martorano "requested the Defendant to put his hands behind his back and placed handcuffs on him." [Doc. #24, at p. 5-6 & Doc. #34, at p. 5]. In the alternative, the government argues that the earliest Defendant was seized was when Officer Martorano ordered Defendant to take his hand out of his pocket and he complied. [Doc. #34, at p. 7].

A seizure occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. <u>Terry</u>, 392 U.S. at 16. Put another way, seizure occurs when there is either "a laying on of hands or application of physical force to restrain movement, even when it is

ultimately unsuccessful," or submission to "a show of authority." <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1991).  Determining which police-citizen encounters fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case.  <u>United States v. Hathcock</u>, 103 F.3d 715, 718 (8th Cir. 1997).  "No litmus-paper test exists for distinguishing a consensual encounter from a seizure." <u>United States v. Ninety One Thousand Nine Hundred Sixty Dollars</u>, 897 F.2d 1457, 1461 (8th Cir.1990).  Rather, a person is "seized" within the meaning of the Fourth Amendment if, "taking into account all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." <u>Michigan v. Chesternut</u>, 486 U.S. 567, 569 (1988).  <u>See</u> <u>also</u> <u>United States v. Mendenhall</u>, 446 U.S. 544, 553-54 (1980).

As set forth above, the police officers decided they would do a "pedestrian check" after watching Defendant and his companion for less than 15 seconds. One could certainly imagine circumstances under which a pedestrian check – as defined by Officer Martorano – could arguably fall short of constituting a seizure under the Fourth Amendment.  However, the situation in this case is not one in which police officers, in a relatively unobtrusive manner, approached individuals on foot to engage in consensual questioning. <u>See</u>, <u>e.g.</u>, <u>Florida v. Royer</u>, 460 U.S. 491 (1980)(holding that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street and asking if he is willing to answer some questions).

Rather, here, Defendant and Mr. Crockett were walking along the street at nine at night when the officers drove their unmarked car toward the two men, stopping within five feet of them. As the car was stopping, Officer Martorano simultaneously got out of the car with his flashlight, immediately "hit them" with a beam of LED light, which is a lot brighter than a normal bulb flashlight, and yelled "Police." Although he was not in uniform, Officer Martorano was wearing a vest with the word "POLICE" largely displayed across the chest. He was also wearing his badge in plain sight, on a lanyard around his neck. Indeed, Officer Martorano testified that his purpose in yelling police and shining the flashlight was "to let them know that this is the police." A logical inference to be drawn from this testimony is that the point of letting the men know "this is the police" was so they would yield to the officers' authority and stop -- which is precisely what they did.

When an officer, through show of authority, provokes an individual to feel their compliance is necessary, a Fourth Amendment seizure has occurred. For example, in United States v. Peoples, 925 F.2d 1082 (8th Cir.1991) the Eighth Circuit held that the seizure of the Defendant occurred when the officers ordered the suspects to stop, finding, at that moment, there was a clear order for the suspects to submit to the officers. This order was given after the officer had shined his spotlight on the entire area and both officers began asserting the order from different directions. In so holding, the court rejected arguments that the seizure occurred later in time after the suspect stopped walking and obeyed the officers' command to stop. Peoples, 925 F.2d at 1086

n.2.   The court concluded "[t]hese actions by the officers amount to a show of authority such that a reasonable person would have believed that he or she was not free to leave." <u>Peoples</u>, 925 F.2d at 1085-86.

Here, although Officer Martorano did not specifically use the word "stop," his actions would have conveyed to a reasonable person that he or she was being ordered to stop.  Given the totality of the circumstances surrounding the pedestrian stop, Defendant was seized from the point at which Officer Martorano jumped out of his car, shined his flashlight and yelled "Police" because, at that point, a reasonable person would not have felt at liberty to ignore the police presence and go about his business.  <u>Hodari D.</u>, 499 U.S. at 627.

Officer Martorano's testimony that Defendant "somewhat" turned the right side of his body away in a defensive or "blading" manner after he yelled "Police" does not alter the foregoing point-of-seizure analysis.  The government presented no evidence that Defendant attempted to flee or otherwise evade the officers.  While Defendant's continued movement may be relevant for other purposes, it does not change the conclusion that under the facts presented here a reasonable person would believe that he or she was ***not*** free to leave. The Eighth Circuit reached a similar conclusion in <u>Peoples</u>:

> It is similarly arguable that the seizure occurred later, after Skinner dropped the bag into the van, stopped walking and obeyed the officers' commands to stop. The suspects were freely moving about up to this point. However, under *Mendenhall,* the test to determine when a seizure occurs is objective rather than subjective. On the facts of this case, we conclude that a reasonable person would believe that he or she was not free to leave when the officers ordered Peoples

and Skinner to stop. The suspects' continued movements, of course, are relevant to the question of probable cause to arrest.

*Peoples*, 925 F.2d at 1086 n. 2 (quoting <u>Kolender v. Lawson</u>, 461 U.S. 352, 366 n.4 (1983) and <u>Sibron v. New York</u>, 392 U.S. 40, 66-67 (1968)).

B. **Reasonable Suspicion For The Stop**

Having determined when the seizure of Defendant occurred, the court next determines whether it was supported by reasonable suspicion. Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>See</u> <u>United States v. Cortez</u>, 449 U.S. 411, 417–18 (1981). As the Supreme Court reasoned in <u>Terry</u>, an officer's objective basis for suspicion must be particularized because the "demand for specificity in the information upon which police action is predicated is the central teaching of [the] Court's Fourth Amendment jurisprudence." <u>Terry</u>, 392 U.S. at 22 n. 18. As such, the suspicion must derive from more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. <u>See</u> <u>also</u> <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989). In determining whether a police officer had reasonable suspicion of criminal activity, the court must consider the "totality of the circumstances" as "understood by those versed in the field of law enforcement." <u>United States v. Gray</u>, 213 F.3d 998, 1000 (8th Cir. 2000) (quoting <u>Cortez</u>, 449 U.S. at 418)).

Here, the factors that informed the officers' decision to conduct a pedestrian check of Defendant and his companion were (a) a reported spike of burglaries and robberies in the area and (b) Officer Martorano's observations of Defendant and Mr. Crockett wandering relatively close to a vacant residence for less than 15 seconds. The ultimate determination of reasonable suspicion turns, not on an analysis of these factors in isolation, but as part of the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 274 (2002).

### 1. *Reported crime spike*

The fact that there was a reported spike in burglaries and robberies in the neighborhood in question, without more, is not enough to supply reasonable suspicion for a Terry stop. The Supreme Court in Brown v. Texas, found there was no basis for suspecting individuals of criminal activity based on their presence in a neighborhood known for drug trafficking. Brown v. Texas, 443 U.S. 47, 52 (1979).

In Brown, the officer who observed the two individuals testified the situation "looked suspicious." Id. However, the court found the evidence insufficient in establishing the behavior of the individuals was unusual within that neighborhood. Id. Therefore, the court held "the fact appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding appellant was engaged in criminal conduct." Id. See also Johnson v. Phillips, 664 F.3d 232, 237 (8th Cir. 2011) (citing Brown, 443 U.S. at 52, for the proposition that it is "clearly established that a person's presence in a

suspicious location does not, in and of itself, provide law enforcement with a reasonable, articulable suspicion").

Here, Officer Martorano testified he was given a "general briefing to be on the lookout for robberies, burglaries, guns, and that sort of stuff," due to a recent crime spike in the neighborhood. He had no specific information indicating that either Defendant or Mr. Crockett or even individuals fitting their description were involved in any sort of criminal activity. Under <u>Brown</u>, the mere fact that Defendant was walking in a high crime neighborhood does not, by itself, establish reasonable suspicion. <u>Brown</u>, 443 U.S. at 52; <u>Phillips</u>, 664 F.3d at, 237.

### 2. *Officer Martorano's Observations*

The "suspicious" conduct observed by Officer Martorano before he decided to conduct a pedestrian check consisted of two men in dark clothing standing "relatively close" to a residence the officer believed to be vacant. One man was "wandering around the front of the residence" and the other man was located closer to the sidewalk in front of the residence. Officer Martorano observed the man closer to the sidewalk "every now and then to be kind of looking around, looking left, looking right, and just kind of looking up and down the street." Officer Martorano observed the above described conduct for a "brief" amount of time, 10-15 seconds, before the two men walked away. Based on his observations, Officer Martorano concluded that the man on the sidewalk was keeping a "lookout" and the man closer to the house was "casing" the residence or looking for a point of entry. Officer Martorano further

concluded the men must have been either attempting or contemplating a burglary.

Even coupled with the reported crime spike and with due deference to Officer Martorano's experience, these facts cannot support a finding of reasonable suspicion of an attempted or contemplated burglary. Other than describing his observations, Officer Martorano offered no explanation why, based on his training or experience, this conduct lead him to believe the men were engaged in or contemplating burglary. His conclusion that the man wandering closer to the house appeared be "casing" or looking for a point of entry is unsupported by specific facts. Compare Tillman v. State, 630 S.W.2d 5 (Ark. 1982) (finding conduct consistent with casing supported finding of reasonable suspicion where neighbor in sparsely settled area reported seeing strange vehicle driving very slowly with driver looking at houses as if casing them for burglary) with People v. Johnson, 474 N.E.2d 241 (N.Y. 1984) (holding that the mere fact defendant was looking at houses was insufficient where there was no other testimony suggesting defendant's behavior was furtive or his movements unusual).

In addition, as noted above, Officer Martorano admitted on cross examination that before encountering Defendant and Mr. Crockett he did not have any specific information about either man committing any sort of crimes. (Tr., p. 34). Officer Martorano also conceded that the briefing he received about the crime spike was general and did not include anything specific about the alleged involvement of middle-aged African American men and agreed that

the area was predominantly an African American neighborhood. (Tr., p. 34-35). As such, it follows that it would not be unusual to see two African American men walking together in that particular neighborhood.

The government presented no evidence that the officers observed Defendant and/or Mr. Crockett breaking any laws,[2] and Officer Martorano denied that he observed either man with burglary tools or items that appeared to be burglary tools. There was also no evidence or explanation to suggest that there was anything unusual about these men wearing dark clothing in winter. Finally, there was no evidence that the nature of the reported burglary spike involved vacant residences. Without further support, these facts to do not amount to "suspicious" conduct, especially given Officer Martorano's testimony that he observed this conduct for no more than 15 seconds and the men walked (and did not run) away from the residence without any indication that their activity was interrupted by the presence of law enforcement or an unrecognized car. Indeed, there is no evidence that Defendant or his companion attempted to flee when encountered by police or conducted themselves in a manner suggesting consciousness of guilt.

There are a number of innocent reasons why residents of a neighborhood may be seen walking or even standing "relatively close" to homes in their neighborhood before 10 p.m. at night. Although an analysis of what amounts to reasonable suspicion need not rule out the possibility of innocent conduct,

---

[2] For example there was no evidence that there were any "No Trespassing" signs posted, fencing, or anything else that would indicate that the subjects may have been were knowingly trespassing.

see Illinois v. Wardlow, 528 U.S. 119, 125 (2000), conduct typical of a broad category of innocent people provides a weak basis for suspicion.  Reid v. Georgia, 448 U.S. 438, 441 (1979).  See also United States v. Crawford, 891 F.2d 680, 683 (8th Cir. 1989) (holding that acts that were "too susceptible to innocent explanation" were insufficient grounds for finding reasonable suspicion).

In United States v. Gray, 213 F.3d 998 (8th Cir. 2000), the Eighth Circuit held that facts similar to those at issue in this case did not support a finding that the detaining officer had reasonable suspicion that criminal activity was afoot even when viewed from the vantage point of those versed in the field of law enforcement.  Gray, 213 F.3d at 1000-1001.  The court held:

> Viewed in their totality, the circumstances cited by the government do not support a finding of reasonable suspicion. Gray was walking and then standing on the street in a high-crime area before 10:00 at night in cold weather. Suspected prostitutes were nearby, but Gray had no contact with them. Though Gray hurried across the street, there was no sudden flight at the sight of law enforcement, as in Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).  To the contrary, Gray remained in the area, stopped when the officers approached, identified himself, and answered their questions willingly. 'Too many people fit this description for it to justify a reasonable suspicion of criminal activity.'

Gray, 213 F.3d at 1000-1001, citing United States v. Eustaquio, 198 F.3d 1068, 1071 (8th Cir. 1999).

The facts presented in this case stand in stark contrast to facts in other cases where courts have found reasonable suspicion to justify a Terry stop.  See, e.g., United States v. Cash, 378 F.3d 745, 748 (8th Cir. 2004) (extreme

nervousness toward officers, furtiveness in concealing illegal activity, and walking away from officers may establish reasonable suspicion); United States v. Banks, 553 F.3d 1101, 1104 (8th Cir. 2009) (officers witnessing an individual violate a statute had the authority to stop the individual to advise him of his violation); United States v. Abokhai, 829 F.2d 666 (8th Cir. 1987) (suspicious activity at Texaco station; officer aware nearby Texaco station had been robbed just days before).

As such, based upon the record facts before this court, the totality of the circumstances do not support a finding that the detaining officer had reasonable suspicion that criminal activity was afoot even when viewed from the vantage point of those versed in the field of law enforcement. See Gray, 213 F.3d at 1000-1001.

### 3. Defendant's "Blading" Motion

In its post-hearing brief, the government contends that Defendant's blading motion "furthered Detective Martorano's suspicion that Defendant was involved in a possible burglary or attempted burglary" of the vacant residence. [Doc. #34, at p. 11]. For the reasons set forth above, the undersigned finds that Defendant was already seized for Fourth Amendment purposes when Officer Martorano observed the blading movement. As such, it is neither necessary nor appropriate to consider Officer Martorano's testimony about the "blading" motion as part of the police justification for the stop. "Conduct after an investigative stop begins cannot supply the reasonable suspicion needed to justify the stop." United States v. Stewart, 631 F.3d 453, 457 (8th Cir. 2011)

(quoting United States v. Davis, 202 F.3d 1060, 1062 (8th Cir.), cert. denied, 531 U.S. 883, 121 S.Ct. 199, 148 L.Ed.2d 139 (2000).

Nor can "officer safety" provide justification for a protective frisk in the absence of a valid stop.  "Officers may conduct a protective pat-down search for weapons during a valid stop—whether a traffic stop or an investigative Terry stop or a consensual stop—when they have objectively reasonable suspicion that a person with whom they are dealing 'might be armed and presently dangerous and criminal activity might be afoot.'" United States v. Robinson, 664 F.3d 701, 704 (8th Cir. 2011) (quoting Davis, 202 F.3d at 1063).  However, under Terry, "there must be reasonable suspicion of on-going criminal activity justifying a **stop** before a coercive **frisk** may be constitutionally employed." United States v. Jones, 606 F.3d 964, 967 (8th Cir. 2010) (emphasis in original).

For the reasons set forth above, the frisk in this case was not preceded by a consensual encounter between law enforcement and pedestrians. Rather, it was conducted as part of an investigatory stop that was not supported by reasonable articulable suspicion at the point of seizure.  As such, the subsequent pat down was unlawful and the firearm should be suppressed as the fruit of an unlawful search and seizure.

A "totality of the circumstances" analysis that included the blading testimony would undoubtedly make this a much closer case.  However, even when the blading testimony is taken into account, the facts here fall short of supporting a finding that Defendant was attempting or contemplating burglary **and** was presently armed and dangerous.  United States v. Gray, 213 F.3d at

1000. "There must be articulable and specific facts as to dangerousness."
<u>Hughes</u>, 517 F.3d 1013, 1016.

Under the facts of this case, when the officers first decided to stop the two pedestrians, they were walking down the street away from the vacant residence and neither man was observed carrying any suspected contraband. As such, to the extent it existed at all, any need for immediate police action was diminished before the encounter began. <u>See</u> <u>United States v. Watts</u>, 7 F.3d 122, 126 (8th Cir. 1993) (holding "an investigative stop must cease once reasonable suspicion or probably cause dissipates").

Although Defendant bladed his body "somewhat" and then put his right hand in his right jacket pocket when he was first confronted by the officers, Defendant immediately complied with Officer Martorano's order to remove his hand from his pocket. As Officer Martorano himself testified, once he is able to "see hands free" during an encounter with the public, he knows he is "that much safer." Other than this single blading motion, followed by immediate compliance, the government offered no other evidence to support a conclusion that Defendant was armed ***and*** presently dangerous when confronted by police.

Unlike other cases where justification has been found for a stop and protective frisk, as noted above there was no evidence that prior burglaries in the neighborhood involved vacant residences or even involved residences at all. In addition, there was no pre-frisk determination by the officers that Defendant had a prior felony conviction; no statements by Defendant during the

encounter that were inconsistent with the officers' observations of Defendant's actions prior to the stop; and no evidence (other than the blading movement itself) that Defendant's deportment during the encounter contributed in any way to the officers' suspicion that he was armed and presently dangerous. Compare Stewart, 631 F.3d at 457-58, and cases cited therein. In sum, while the undersigned does not believe that the blading movement should properly be considered as part of the "reasonable suspicion" analysis, even when that evidence is considered, the totality of the circumstances simply do not support a finding that there was reasonable articulable suspicion that criminal activity was afoot and that Defendant was presently dangerous.

In so holding, the undersigned does not intend to underestimate the value of investigative stops in crime prevention or protective frisks in guarding the safety of law enforcement officers and others who may be in harm's way. However, as the Eighth Circuit has pointed out, "being stopped and frisked on the street is a substantial invasion of an individual's interest to be free from arbitrary interference by police" particularly where, as in this case, the police have less invasive options for identifying the perpetrators of crime. Hughes, 517 F.3d at 1018. See also Jones, 606 F.3d at 968 (quoting Hughes). Under the circumstances presented here, the officers certainly had the less invasive option of continuing their surveillance of the two individuals beyond 15 seconds to see if, for example, they doubled back to the vacant residence or otherwise behaved in a manner that "may both crystallize previously

unconfirmed suspicions of criminal activity and give rise to legitimate concerns for officer safety." <u>Jones</u>, 606 F.3d at 968.

## **CONCLUSION**

In sum, the government failed to show that the officers had reasonable suspicion that Defendant was engaged in criminal activity and was presently armed and dangerous when they stopped him to conduct a pedestrian check. As such, the firearm and any statements made by Defendant following the stop must be suppressed as fruits of an unlawful search and seizure. <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963); <u>see</u> <u>also</u> <u>United States v. Wipf</u>, 397 F.3d 677, 683 (8th Cir.2005) ("Under the 'fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality."). For the foregoing reasons, Defendant's motion to suppress should be granted.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this <u>19th</u> day of  October, 2012.