UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:12CR290JCH(SPM) |
| ) | |
| JULIUS E. HAYDEN, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the undersigned United States Magistrate Judge on the United States' Motion for Reconsideration of the undersigned's Report and Recommendation dated October 19, 2012, [Doc. 36], which recommended suppression of a firearm and statements made by Defendant Julius Hayden. [Doc. 19]. In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that the Government's Motion for Reconsideration be **GRANTED**. [Doc. 37].

**IT IS FURTHER RECOMMENDED** that the supplemental evidence offered by the Government be included in the record facts on the issue of suppression.

**IT IS FURTHER RECOMMENDED** that the undersigned's initial Report and Recommendation be **VACATED.** [Doc. 36].

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements be **DENIED**. [Doc. 19].

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set on **March 11, 2013,** at **9 a.m.** before the Honorable Jean C. Hamilton.

          /s/Shirley Padmore Mensah
          SHIRLEY PADMORE MENSAH
          UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of January, 2013.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CR290JCH(SPM) |
| | ) | |
| JULIUS E. HAYDEN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

The United States has moved for reconsideration of the undersigned United States Magistrate Judge's Report and Recommendation which recommended suppression of a firearm and statements made by Defendant Julius Hayden (hereafter referred to as the "R&R"). [Doc. 37]. In the R&R, I concluded Defendant was seized from the point when Officer Martorano got out of his car, shined his flashlight and yelled "Police" because, based on the totality of the circumstances presented, a reasonable person would not have felt at liberty to ignore the police presence and go about his business. I further concluded that, at the time of this seizure, the police officers did not have reasonable articulable suspicion to seize Defendant as required under *Terry v. Ohio,* 392 U.S. 1. My conclusions were predicated on the evidence presented at the suppression hearing, which consisted solely of testimony by Officer Martorano.

In seeking reconsideration, the Government contends, among other things, that the foregoing conclusions were wrong as a matter of law. The Government also challenges the factual findings in the R&R and argues that the court drew erroneous inferences from the evidence that was presented. The Government requested a supplemental hearing and offered

additional evidence to clarify some of the issues raised in the R&R.  *See* Govt.'s Motion for Reconsideration, Doc. 37, p. 2.

On November 13, 2012, over the Defendant's objection, I held a supplemental evidentiary hearing.  At the hearing, the Government called Detective Michael Kegel to testify, and the Defendant called Federal Public Defender Investigator, Ernest Birch, to testify.  The transcript of that hearing was filed on November 20, 2012.  [Doc. 45].  Following the supplemental hearing, at the court's request, Defendant filed a post hearing brief on December 4, 2012, [Doc. 46] and the United States filed its post hearing brief on December 14, 2012.  [Doc. 47].

In opposing the Government's Motion, Defendant argues, among other things that (i) the court should not have permitted the supplemental hearing and (ii) even when the supplemental evidence is considered, the Government's proof falls short of the reasonable suspicion required under *Terry*.  *See* Deft.'s Brief, [Doc. 46].

After carefully considering the written submissions of the parties and the supplemental evidence, the undersigned finds that the Government's Motion for Reconsideration should be granted, and makes the following Findings of Fact and Recommendations of Law.

## FACTUAL FINDINGS

Defendant was charged with being a felon in possession of a firearm by way of an indictment.  The firearm was seized when St. Louis City police officers stopped and frisked Defendant while he and a friend were walking down the street.  Defendant filed a motion to suppress the firearm and statements made to the officers before and after his arrest on grounds that they were the fruit of an unlawful search and seizure.  [Doc.19].  Defendant argued that the

officers did not have "reasonable suspicion" to stop and frisk him as required under *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968).

### A. Evidence Presented At The Initial Suppression Hearing

The evidence the Government initially offered in response to the suppression motion consisted solely of testimony by St. Louis City Police Officer Nicholas Martorano. In essence, Officer Martorano testified that on the evening of December 20, 2011, he and his partner, Officer Mike Kegel, were patrolling the vicinity of Evans and Whittier in an unmarked police vehicle due to a reported spike of burglaries and robberies in the area. The officers' suspicions were aroused when they observed two men "wandering" "relatively close" to a vacant residence near the 4100 block of Evans. After less than 15 seconds of this activity, the men started walking down the street, with no indication that they ever became aware of being watched. *See* R&R, Doc. 36, pp. 3-8.

According to Officer Martorano, he and Officer Kegel decided to conduct a "pedestrian check" which, as described, is a non-custodial encounter. The officers initiated this encounter by pulling their unmarked car to within five feet of Defendant and his companion, Mr. James Crockett, as they were about to cross the street. The car was close enough to the men that when Officer Martorano subsequently decided to conduct a pat down, he did not have to tell Defendant to "come closer" to the car. While the car was stopping, Officer Martorano simultaneously got out of the car, "hit" the men with a beam of his LED flashlight and "yelled" "Police." Although he was not in uniform, Officer Martorano was wearing a vest with the word "POLICE" emblazoned across the front in letters that were between 6 inches to a foot high. Doc. 36, pp. 5-8. *See also* 9/20/2012 Evidentiary Hearing Transcript, Doc. 32, pp. 9, 17-20, 39.

When he yelled "Police" Officer Martorano observed Defendant "blade" the right side of his body away from the officers and put his right hand in his right jacket pocket.[1] Officer Martorano ordered Defendant to take his hand out of his pocket. Defendant immediately complied. Officer Martorano subsequently told Defendant he was going to pat him down and asked if Defendant had anything on him that could "poke or stick" him. In response, Defendant said he had a gun on him and indicated it was in his right jacket pocket. Officer Martorano frisked Defendant and retrieved a .22 caliber firearm from Defendant's right jacket pocket. A search of Mr. Crockett revealed that he too was carrying a handgun. Defendant and Mr. Crockett were subsequently arrested and taken to the police station where each man gave a recorded statement to police. *See* Doc. 32, p. 16-17, 19-23, 25-26.

With one exception, I adopt and incorporate by reference all of the factual findings from the initial R&R as if they are fully restated here. In its Motion for Reconsideration, the Government objects to my finding that "Defendant's account of his actions immediately before his arrest was corroborated by Mr. Crockett's separate post-arrest statement to police" is well taken. [Doc. 37, pp. 30-33]. As the Government correctly points out, Mr. Crockett's post-arrest statement was neither offered by the Government nor received into evidence by me. Rather, the Government inadvertently submitted it along with Defendant's recorded statement. While I do not believe the error was prejudicial, it was nevertheless error for me to review the statement and include Crockett's statement in my factual findings. As such, Mr. Crockett's Statement and my related finding are excluded and should not be considered.

The Government also raised a number of other objections to the factual findings in the R&R as well as inferences I drew from those facts. *See* [Doc. 37, pp. 23-37]. Because I now

---

[1] Officer Martorano defined "blading" as a defensive stance in which an individual who is being confronted turns away or conceals part of his or her body. (Doc. 32, p. 21).

believe that the initial R&R should be vacated in light of the supplemental evidence offered by the Government, the Government's remaining objections to the factual findings and inferences drawn in the R&R are moot.[2]

### B. Additional Facts Regarding Seizure

In its Motion for Reconsideration, the Government offered additional evidence to support its argument that Defendant was not seized before the arresting officer observed Defendant make a blading motion and place his hand into his jacket pocket. More specifically, the Government called Officer Mike Kegel to testify at the supplemental hearing, and offered into evidence, without objection, several photographs depicting the events leading to Defendant's arrest. Based on the additional evidence presented by the Government, the undersigned makes the additional factual findings relative to the point of seizure analysis:

- The officers approached the two men in their vehicle at a speed of about 10 miles an hour. Officer Kegel, who was driving, testified that he "kind of rolled through the stop sign, and then as [they] approached [the men], [they] just parked to the curb just short of where the sidewalk was. [The vehicle] came to a slow stop." [Doc., 45, p. 50].

- The officers did not block the progress of either individual. Based on where the police vehicle was situated, the men could have easily turned right and continue walking up the sidewalk or turned left and crossed the street. [Doc. 45, p. 50; Exhs. EH7 and EH8].

---

[2] More specifically, the Government challenged my credibility finding regarding Officer Martorano's testimony that one of the subjects "glanced" through a window. [Doc. 37, 24-28]. Although I disagree with the Government's contention that my credibility finding was in error, this argument is moot because as detailed below, based on Officer Kegel's testimony and the photographs presented, I now find that the officers did observe one of the men look through a window. Also rendered moot by my conclusions in this Memorandum, are the Government's challenge to my decision to include in the factual findings the fact that neither man was seen with a pry bar or other burglary tool, [doc. 28-30], the inference I drew that based on the manner in which they approached the two men, they wanted them to stop [doc. 37, pp. 33-35], my conclusion that based on his testimony Officer Martorano exited the car with some exigency [doc. 37, pp. 35-36], and my reference to the fact that there was no evidence that either man tried to flee [doc. 37, p. 36].

5

- The officers did not "jump" out of the car. Instead, when the officers stopped their vehicle, Officer Martorano exited the passenger side of the vehicle without "any kind of exigency. He just got out of the vehicle." [Doc., 45, p. 50].

- As Detective Martorano was getting out of the car, he shined the flashlight towards the midsection of the two men and in a "clear voice stated Police." Based on Officer Kegel's in court demonstration, although Officer Martorano said the word "Police" loud enough for the men to hear him, he did not scream or shout. [Doc., 45, p. 53-54].

- Officer Kegel also testified that one potential problem with the use of a flashlight is that even if it is not pointed at the subject's face it can "kind of blind [him or her] a little bit." As a result, the subject may have been unable to see the word "Police" written on the vest or the lanyards they were wearing around their necks. [Doc. 45, p. 56].

**C. Additional Facts Regarding Reasonable Suspicion**

To further support the argument that the officers had the requisite reasonable articulable suspicion under *Terry*, the Government offered supplemental evidence again in the form of testimony from Officer Kegel and photographs. Based on the additional evidence presented by the Government, the undersigned makes the additional factual findings relative to the issue of whether there was reasonable suspicion for the stop:

- Officer Mike Kegel has been a police officer with the St. Louis Metropolitan Police Department for six years. Three and one half of those years have been as a patrol officer. [Doc. 45, p. 8-9]

- During this 3 ½ years of experience as a patrol officer, Officer Kegel has been involved in the investigation of burglaries on a regular basis. Officer Kegel believes he has been involved in a minimum of approximately 400 burglary investigations in 3 ½ years. [Doc. 45, p. 10]

- Of those 400 investigations, only approximately 15-20 have involved burglaries of businesses. The remaining were burglaries of residences. Of the 380 investigations concerning residences, half of those investigations concerned burglaries of vacant homes. [Doc. 45, p. 11]

- Based on his experience, Officer Kegel has learned that vacant homes are a favorable target of burglars for several reasons. First, there is no one inside the residence to report the burglary. Thus, it might be several days

6

to weeks or months before a burglary is even noticed. Second, many vacant homes are in the process of being rehabilitated. This usually involves carpenters and contractors. Often, carpenters and contractors leave tools inside the residence and that equipment is worth a lot of money. Third, there are numerous items in the vacant homes that are worth money. These items include: furnaces, water heaters, copper piping, copper wiring, staircases, air conditioners (window units), and stoves and ovens. Fourth, sometimes people enter the vacant homes not with the intention to steal, but instead to engage in other criminal activity such as trespass for the purpose of using drugs, engaging in activity with prostitutes, etc. [Doc. 45, p. 11-13]

- On December 20, 2011, during a general briefing at the start of their shift, the Sergeant informed the officers that there had been a spike in robberies and burglaries in the area of the Ninth District within the previous two weeks. Based upon Kegel's experience, the fact that the Sergeant did not specify that the burglaries involved businesses indicated to the officers that they were concerned with a spike in robberies and burglaries of residences. [Doc. 45, p. 17-18]

- The neighborhood in which this incident took place is a high crime neighborhood. There are significant numbers of robberies, assaults and drug dealing that occur in this area. It is rare to see people outside after dark. In Kegel's experience, in high crime neighborhoods such as the one at issue it would be unusual to see people taking evening strolls or walking their dogs once it becomes dark. Because there is little, if any, activity after dark in these high-crime neighborhoods, when police officers see people wandering about after dark, it instantly draws their attention. [Doc. 45, p. 20-23]

- As the officers approached the intersection of the 4100 block of Evans and Whittier, they observed two subjects in front of the house closest to the northeast corner of Evans and Whittier. There were no other people out walking around. They drew the officers' attention because they were the only two out, it was cold, it was dark, and they were wearing dark clothing. The officers stopped for a second to see what the two individuals might have been doing. [Doc. 45, p. 26-27].

- When the officers curbed their vehicle, the officers were at a distance close enough to see what the suspects were doing. Although it was dark out, there was a street light directly over the residence which illuminated the area well enough that the officers could see that the two subjects were roughly 6 feet tall and wearing dark clothing. They could also see the activity of the individuals, although not well enough that they could decipher more particular identifying characteristics. [Doc. 45, p. 27-30, 33-34; Exh. EH3]

7

- The officers observed the two suspects for a period of ten to fifteen seconds. Based on the photographs, Officer Kegel's testimony and in-court demonstration, one individual was standing on the sidewalk with the front of his body entirely facing the residence. His back was toward the street. He was stationary on the sidewalk but was turning his head back and forth to look up and down the street. [Doc., 45, p. 34-36; Exh. EH4].

- The second individual who was closer to the residence, was only a matter of feet from the front of the residence. His attention was directed entirely toward the front of the residence. He stood in one place for a few seconds staring at the house, moving his head from left to right. He then moved several feet to the right, still in front of the house but now in front of the front window, continuing to stare at the house with his head moving from left to right and back again. At one point the subject leaned his head far over to his right appearing to glance into the front window. His head movement suggested to the officers that he was scanning the house for either occupancy or for a point of entrance. [Doc. 45, p. 39-40, 86-87; Exhs. EH5 and EH6].

- The Government offered photographs, Exhibits EH5 and EH6, which depict the positioning and movement of the subject who was closer to the residence. The photographs also show that the front of the yard has a fence at the front walk. Thus, the individual closer to the residence had to cross the fence to get close to the residence. [Doc., 45, p. 41-43 & Exhibits EH5 and EH6].

- All of this conduct indicated to the officers, based upon their training and experience, that the individuals were "casing" the property for a burglary. [Doc., 45, p. 41-43].

- The officers did not observe either individual to have a pry bar or any other traditional tools of burglary. However, the absence of a pry bar or other traditional tools was of no significance to the officers. In the burglary investigations in which Officer Kegel has been involved, he cannot recall ever having found a suspect to have a pry bar or to use a pry bar in the burglary. [Doc. 45, p. 46-47].

Defendant offered testimony of Mr. Ernest Birch and Defense Exhibits A-D. Mr. Birch's testimony and related exhibits were offered to rebut the testimony of Detective Kegel regarding the location of the residence, and the officers' claimed vantage point and ability to observe the movements of the subjects on the evening of December 20th. While I find that Mr. Birch gave

truthful and accurate testimony, because Mr. Birch was not present during the incident, and because his testimony was based on an interview of Defendant's companion several months after the incident, I do not find that his testimony rebutted either the testimony by Officer Kegel or the other evidence presented by the Government.

## DISCUSSION

### A. The Decision To Allow The Supplemental Hearing

Defendant argues that the Government should not have been given a second bite at the apple to supplement the record because the Government was on notice of the issues raised by Defendant's motion to suppress and the proffered evidence was available to the Government at the time of the initial hearing. Defendant cites several cases in support of his position. [Doc. 46, p. 5]. However, those cases make clear that in light of the procedural posture of this case – namely, no final judgment has been entered -- the court retains the discretion to reopen the record on the motion to suppress. *See United States. v. Chavez Loya,* 528 F.3d 546, 555 (8th Cir. 2008) (citing *United States v. Johnson,* 944 F.2d 396, 403 n.5 (8th Cir. 1991)); *United States v. Gill,* 513 F.3d 836, 846 (8th Cir. 2008), *cert. denied,* 129 S.Ct. 750 (2008).

Although I found no Eighth Circuit cases that specifically address the issue, courts in other jurisdictions have applied a rule requiring the government to proffer a justification for its failure to present the relevant evidence at the original suppression hearing when the government has moved for reconsideration of a suppression order on the ground that it can introduce new evidence intended to show that no Fourth Amendment violation occurred. *See, e.g., United States v. Villabona–Garnica,* 63 F.3d 1051, 1055 (11th Cir. 1995) ("[B]y failing to raise [an] issue at [a] suppression hearing without offering any justification therefor, the government waive[s] its right to assert it in subsequent proceedings." (quoting *United States v. Thompson,*

9

710 F.2d 1500, 1504 (11th Cir. 1983)) (internal quotation marks omitted) (alterations in *Villabona–Garnica* )); *McRae v. United States,* 420 F.2d 1283, 1286–88 (D.C.Cir. 1969).

However, citing a policy in favor of introduction of lawfully obtained evidence, other courts have declined to impose such a justification requirement. *See United States v. Rabb,* 752 F.2d 1320, 1323 (9th Cir. 1984) ("We reject *McRae's* 'justification' requirement and adopt the Fifth and Seventh Circuits' position: if the record reveals matters which indicate that the evidence was lawfully obtained, the district court may reconsider its suppression order at trial") *abrogated on other grounds by United States v. Franco-Beltran*, 229 Fed.Appx. 592, 594 n.1 (9th Cir. 2007); *United States v. Regilio,* 669 F.2d 1169, 1177 (7th Cir. 1981) ("If matters appearing [after the original suppression decision] indicate that no constitutional violation occurred, society's interest in admitting all relevant evidence militates strongly in favor of permitting reconsideration."); *United States v. Scott,* 524 F.2d 465, 467 (5th Cir. 1975).

Regardless of whether justification is or is not required, I find that in this case there were sufficient grounds for reopening the suppression hearing. In response to the concerns I raised in the R&R about the paucity of evidence, the Government offered testimony of a second officer present at the time of Defendant's arrest to provide a more detailed narration of the circumstances surrounding the arrest. *See United States v. Bayless*, 201 F.3d 116, 132 (2d Cir. 2000) (where the government reasonably believed corroborating testimony by a second arresting officer would have been cumulative at the initial evidentiary hearing, trial judge did not err in granting the government's motion to reopen the suppression hearing). While I agree with Defendant that the Government was on notice about the issues that would be raised at the hearing and empathize with the sentiment expressed by Defendant that it seems patently unfair to allow the Government a second bite at the apple, when, as in this case, the court is confronted with

proof -- not previously presented – that the evidence may have been lawfully obtained, "vague notions of unfairness, that the government should not have two bites off the same apple, ought not control." *Bayless*, 201 F.3d at 132 (quoting *United States v. Tucker*, 380 F.2d 206, 214 (2d Cir. 1967) (internal quotations omitted)).

### B. The Point of Seizure Analysis

In determining the point at which Defendant was seized for Fourth Amendment purposes, the test I articulated and applied in the R&R was whether "taking into account all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." [Doc. 36, pp. 9-13]. The Government argues this analysis was wrong as a matter of law because I erroneously relied on the officers' use of a flashlight and failed to examine the presence or absence of seven non-exclusive factors the Eighth Circuit has considered in determining whether a reasonable person would feel free to terminate the encounter. The Government also argues the R&R's finding is unsupported by the law in the Eighth Circuit. [Doc. 37, at pp. 2-14].

#### 1. *Show of Authority Factors*

As the Government correctly points out, in cases were seizure is alleged to have occurred via a show of authority by police, the Eighth Circuit has consistently examined the presence or absence of the following seven non-exclusive factors in making the ultimate determination of whether a reasonable person would feel free to terminate an encounter with police:

> (i) officers positioning themselves in a way to limit the person's freedom of movement, (ii) the presence of several officers, (iii) the display of weapons by officers, (iv) physical touching, (v) the use of language or intonation indicating compliance is necessary, (vi) the officer's retention of the person's property, or (vii) an officer's indication the person is the focus of a particular investigation.

*United States v. Mabery*, 686 F.3d 591, 596 (8th Cir. 2012); *United States v. Villa-Gonzalez,* 623 F.3d 526, 532-33 (8th Cir. 2010); *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008).

However, the Eighth Circuit has also consistently recognized that

> [d]etermining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case. A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. We consider these matters on a case-by-case basis, as [n]o litmus-paper test exists for distinguishing a consensual encounter from a seizure. The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation.

*Griffith*, 533 F.3d at 983 (internal citations omitted) (citing *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988)); *see also Mabery,* 686 F.3d at 596. While the foregoing "show of authority" factors are intended to help guide the analysis of whether a reasonable person would have felt free to terminate the encounter, the Eighth Circuit has eschewed application of any "rigid mathematical formula" with respect to the relevant factors. *See Villa-Gonzalez*, 623 F.3d at 534 n.4.

In determining the point at which Defendant in this case was seized for purposes of the Fourth Amendment, the relevant factors considered in the R&R were that it was night time; the men were on foot and the officers in a car; the officers stopped their car in close proximity to the two men as they were about to cross the street; the car was close enough to the men that when Officer Martorano decided to conduct a pat down, he did not have to tell Defendant to "come closer" to the car; Officer Martorano was wearing a vest with the word "POLICE" emblazoned across the front in letters that were between 6 inches to a foot high; Officer Martorano got out of the car while it was stopping; Officer Martorano "hit" the men with a bright LED beam of light

12

and "yelled" "Police" to "let them know this is the Police" and the men stopped walking after being confronted by the officers. *See* Doc. 36, pp. 9-13.

Although the R&R did not explicitly list and discuss each of the seven "show of authority" factors, the seizure analysis in the R&R is predicated on facts which reflect the presence of at least two of the factors. First, based on the evidence previously presented, I concluded that the officers limited Defendant's freedom of movement by pulling their vehicle in close proximity to where Defendant and Mr. Crockett were about to cross the street and by hitting them with a bright beam of LED light. Admittedly, the R&R does not spell out this conclusion; however, until the supplemental hearing, it did not at all appear that, had they chosen to, the two men could have continued to cross the street. Second, Officer Martorano's repeated use of the term "yell" to describe the manner in which he said the word "Police" coupled with the apparent exigency with which he exited the vehicle (i.e., "the car was stopping, I was getting out") lead me to the conclusion that the tone used by Officer Martorano would have indicated compliance was necessary.

Notwithstanding the Government's argument to the contrary, there is precedent in the Eighth Circuit that would support my conclusion that a seizure occurred although only a couple of the "show of authority" factors were present. For instance, the defendant in *United States v. White*, 890 F.2d 1413, 1416 (8th Cir. 1989), was approached by two officers in the baggage claim area at Lambert Airport. The officers were standing side by side about two to three feet in front of the defendant; and, there was a row of chairs behind defendant. When asked why he was stopped, the officers told him he exhibited characteristics of those trafficking in drugs. The court held that the presence of factor one -- officers positioning themselves in a way to limit the person's freedom of movement, factor two – presence of several officers, and factor seven -- the

13

person is the focus of a particular investigation contributed to the defendant's "reasonable perception that he was not free to leave immediately." *Id.* at 1416.

### 2. *Use of A Flashlight*

The Government further posits that the use of a flashlight by Officer Martorano is insufficient to constitute a show of authority and cites several cases in support of that position. The cases cited by the Government might have sway if the R&R relied solely on the officer's use of a flashlight. Although shining a flashlight on Defendant in and of itself might not constitute a show of authority, as detailed above, the use of the flashlight was only one factor considered in the "totality of the circumstances" approach adopted in the R&R.

In sum, were it not for the additional evidence presented at the supplemental hearing, even when the "show of authority" factors are expressly considered, I would again conclude that a reasonable person would not have felt he was free to go about his business and ignore the police presence. However, Officer Martorano's testimony coupled with the evidence presented at the supplemental hearing leads me to a different conclusion.

### 3. *Impact of The Additional Evidence Regarding Seizure*

Officer Kegel's testimony and the photographs presented at the supplemental hearing make clear that, although the officers were in a vehicle and the subjects were on foot, the police vehicle stopped far enough from the men that they could not reasonably have felt their physical movements were constrained by the vehicle and the presence of police. In addition, the supplemental evidence clarified that Officer Martorano got out of the vehicle *after* it stopped; and he did so without exigency. Officer Martorano said "police" in a voice loud enough for the men to hear him but – as demonstrated in the court room – it was not said in a tone of voice that

14

would indicate that compliance with the officer's requests might be compelled. *See Mabery*, 686 F.3d at 596.

In light of the additional evidence presented by the Government, I find that the officers' initial approach did not constitute a seizure for Fourth Amendment purposes. Rather, as the Government conceded in its Motion for Reconsideration, Defendant was seized after he bladed his body, placed his hand in his jacket pocket, and complied with Officer Martorano's order to remove his hand from his pocket. *See* Govt.'s Motion, Doc. 37, pp. 13-14.[3]

### C. Reasonable Suspicion

On the issue of reasonable suspicion, the Government argues that the facts known by the police officers at the time they approached Defendant and Mr. Crockett established a reasonable suspicion to believe criminal activity may have been afoot. Govt.'s Motion, [Doc. 37, p. 15]. The Government further suggests that in concluding that the evidence presented failed to support a finding of reasonable suspicion, the court may have confused the higher standard for probable cause to support an arrest with reasonable suspicion for an investigatory stop. *Id.* at p. 17.

As the Government correctly notes in its Motion, because a *Terry* stop impinges to a lesser extent on Fourth Amendment concerns than does an arrest or search, the stricter standard of probable cause does not apply. *See* Motion for Reconsideration, Doc. 37, pp. 17-18; *see also, United States v. Sokolow,* 490 U.S. 1, 7 (1989). However, as noted in the R&R, to establish

---

[3] In hindsight, fixing the point of seizure to a point ***before*** Officer Martorano observed Defendant's blading motion is probably a hair I did not need to split in the R&R. The Government never really disputed that Defendant was seized for Fourth Amendment purposes immediately following the blading motion. Indeed, the Government conceded that, at the earliest, seizure occurred when the officer ordered Defendant to remove his hand from his right jacket pocket. Based on the evidence presented, there was virtually no time lag between the time Officer Martorano yelled "POLICE" and Defendant's compliance with the order to take his hand out of his jacket pocket. As such, although I do not agree with the Government's objection for the reasons stated above, I probably could have and should have treated the officers' approach and the blading as part of one continuous transaction.

reasonable suspicion, the officer must have a particularized and objective basis for suspecting

legal wrongdoing. *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2009) (citing *United

States v. Arvizu*, 534 U.S. 266, 273 (2002)). The officer "in justifying the particular intrusion...

must be able to point to specific and articulable facts which, taken together with rational

inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. An

"inchoate and unparticularized suspicion or hunch" is insufficient to establish reasonable

suspicion. *Id*. at 27. The officer must observe unusual conduct which leads him to reasonably

conclude criminal activity is afoot. *Id.* at 30.

In determining whether a police officer had reasonable suspicion of criminal activity, the

court must consider the "totality of the circumstances" as "understood by those versed in the

field of law enforcement." *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) (quoting

*United States v. Cortez*, 449 U.S. 411, 418 (1981)). But the court must not merely defer to the

police officer's judgment. "The scheme of the Fourth Amendment becomes meaningful only

when it is assured that at some point the conduct of those charged with enforcing the laws can be

subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness

of a particular search or seizure in light of the particular circumstances." *Terry,* 392 U.S. at 21.

At the original evidentiary hearing, Officer Martorano did not testify to specific and

articulable facts that led to his reasonable suspicion, but rather said the man on the sidewalk "just

seemed to be kind of looking around, looking left, looking right, and just kind of looking up and

down the street." [Doc. 32, pp. 10-11]. Regarding his observation of the subject closer to the

residence, he said "I just observed him to be, I guess, what you may call casing the place..."

[Doc. 32, p. 11]. Officer Martorano testified they only observed Defendant and Mr. Crockett for

ten to fifteen seconds before deciding to stop them. [Doc. 32, p. 11]. Officer Martorano also

16

failed to offer any insight as to why the activity he observed would raise the suspicions of someone in the field of law enforcement. Applying the principles detailed above and in the R&R, I find on reconsideration that the evidence presented at the initial hearing fell short of reasonable suspicion and that, in the absence of the supplemental evidence, *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) and other factually similar cases would control.

### *1. Impact of The Additional Evidence Regarding Seizure*

Once Officer Martorano's testimony is fleshed out by the additional evidence presented at the supplemental hearing, an analysis of the totality of the circumstances surrounding the stop compels a different result. In particular, Officer Kegel's testimony and the reenactment photographs provided details about the precise conduct of the two suspects that made the officers suspicious. These previously missing details were rendered even more important to the "reasonable suspicion" calculus because of the brief duration of the officers' observations. In addition, by explaining, for example, that it would be unusual to see residents of a high crime neighborhood – such as the neighborhood in question – walking around after 9 p.m., or that burglaries of vacant residences are fairly commonplace, Officer Kegel's testimony also put in context why this conduct would be suspicious to experienced police officers.

Citing *Terry v. Ohio*, Defendant argues with some force that even when the supplemental evidence is taken into account, the fact that the officers in this case had limited experience and limited time to observe Defendant and Crockett compels a finding that the officers did not have reasonable suspicion under *Terry*. *See* Deft.'s Response, Doc. 46, pp. 18-19.

While I continue to believe this case is a close call, for the reasons set forth above, I find the additional evidence presented by the Government tilts the totality of the circumstances in favor of finding that based on the officers' observations, they could "briefly stop [Defendant]

and make reasonable inquiries aimed at confirming or dispelling [their] suspicion" without running afoul of the Fourth Amendment. *See United States v. Hughes*, 517 F.3d 1013, 1017 (8th Cir. 2009). Because the officers had reasonable suspicion at the inception of the encounter, their decision to frisk Defendant after he bladed his body and placed his hand in his pocket was lawful. *See Terry,* 392 U.S. at 28; *Hughes,* 517 F.3d at 1017. In sum, the presence of previously missing specific and articulable facts justifying the initial encounter brings the encounter and the attending statements and physical evidence seized within the confines of the Fourth Amendment.

## **CONCLUSION**

For the foregoing reasons, the Government's Motion for Reconsideration should be granted, and the supplemental evidence offered by the Government should be included in the record facts on which the Court determines the issue of suppression. When the supplemental evidence presented by the Government is considered, for the reasons stated above, the initial R&R should be vacated and Defendant's motion to suppress should be denied.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of January, 2013.